Okay, our last case is three cases that are consolidated for appeal. We'll hear from the appellants. We know there's some moving in and out that'll go, but we have the time period, so. Thank you, your honors. I'm Mike Duncan, here on behalf of appellant Carl Mann. I'm here because my client, Mr. Mann, finds himself buried in the Bureau of Prisons now for twenty-five years following an investigation that was not performed correctly. And we, at the trial and at a motion to suppress, were not given an opportunity to question that investigation. A wiretap was issued in the early stages of this matter that wasn't necessary. The government's wiretap application that was submitted omitted numerous, numerous facts that the district judge could have, should have had in her wheelhouse to make a decision. There was surveillance in California that just wasn't mentioned to Judge Seymour, the district judge. They had identified the source of supply in California. There was innumerable facts that just weren't presented to the district court in order to make a decision about a wiretap application. So when I hear the words numerous facts omitted and misleading, the thing that pops into my head is Frank's hearing, and am I correct that none of the defendants requested a Frank's wiretap application? That is correct, Your Honor. That is correct. Your Honor, again, from my client's perspective, he was indicted June 5th, 2018. He was arrested in August of 2018. I was appointed to represent him about four years later. And so I was late to the party, very late to the party, and spent six months trying to get assimilated and go, what is happening with this massive issue? And then at, specifically as to my client, tried to investigate certain things in questioning witnesses, in particular the pill-making activities, since my client, again, is serving 25 years, mandatory minimum, as the government's theory of the case was that he was the pill-maker in this conspiracy. And frankly, what, there were pills being made all over the place, all over the Carolinas. The date that the government agents had their takedown, I think there were four machines seized all over the North and South Carolina. And I didn't get an opportunity to question pill-maker, at least what we could determine, pill-maker number one, Mr. Gamble, about his activity. He wasn't charged. Why wasn't he charged? Why was his activity in the... But let me make sure I understand where you are now. I understand your argument about the wiretap and it emitted information. It looks like your argument now seems to be about an inability to question Mr. Gamble. Are you talking about your inability to do so at trial? At trial. Yes, sir. Yes, sir. I did not get an opportunity to... Well, I mean, the district court, I think, ruled that... I mean, the complaint about Gamble, as I understand it, is that you didn't get to ask him questions for which he took a Fifth Amendment in front of the jury. Is that right? That's correct. That I didn't get to... That's the specific legal issue, is that inability to do that. That's correct. I could not fully question him in front of the jury as to what he was involved in and why that activity was legal or illegal. But it seems, what I read the district court as having said, is to the extent we're using that to prove something that seems like improper character evidence, and why is that an abuse of discretion in concluding that asking another individual about his unlawful conduct wouldn't be improper character evidence? Well, not the character evidence, but the fact that Mr. Mann is being prosecuted for... The selective prosecution claim. Selective prosecution, that's right. Don't we have cases, though, saying that it's not an abuse of discretion if the judge knows the witness is going to take the Fifth? It's not an abuse of discretion to say they can't take the Fifth in front of the jury because that would lead the jury to speculate and it prevents the government from cross-examining? I think that's United States v. Branch. That was discussed at the district court. It initially appeared the district judge was going to allow me to do that, and then that case came up. So, yes, short answer to your question, Your Honor, is yes, there is that case law. But, again, questioning the government's investigation was a significant point, and I'm out of time. Thank you, Counsel. Thank you. May it please the Court. Yes, Your Honor. Your Honors, my name is Louis Lang, and I represent Gabriel Ingram. I'm kind of the senior lawyer in this case, both age-wise, I believe, as well as involvement with the matter. I've just passed my sixth anniversary of being involved in this case. I'd like to go back and address briefly the wiretap issue, which in my view, Your Honors, is one of the crucial issues in this case. And to answer Judge Hyten's question, there was a request for a Frank's hearing made by O'Darrius Adams. He is no longer in the case, but all the defendants joined in that motion, which was heard by Judge Lewis orally, and I think in the JA, what we reproduced was his lawyer's motion and was the exhibits that were attached to the motion, because he frankly did a better job than I did in my motion. If I was looking in the record for where your client joined that motion, where would I look? Off the top of my head, I don't know, Judge, but in terms of joining it, we did that, I think, orally when we argued the motion, as well as, I believe, I did it in my motion itself. But I'm happy to supply that JA citation. I don't know it off the top of my head. Okay, because I did not see any indication in the record that your client had ever requested a Frank's hearing. I apologize for that, but we all joined in all those motions. And in terms of the wiretap itself, I'd like to go back to what the wiretap statute title three says, and it requires the government to do a number of things, and these are congressional mandates. They're that the government did not do in this case, but nevertheless is required by title three, is that the government has to tell the district judge the full and complete statement as to whether or not other investigative procedures have been tried and failed. And that seems to me to be two questions. Question number one is, have other investigative procedures been tried? And in that respect, the government said yes. And in particular, the government said yes as to surveillance. But then that next question, which is, have other investigative procedures failed? The government also said yes to that question as well, when they referred to some surveillance that was occurred in the neighborhood of some of these defendants. But in fact, the surveillance had been remarkably successful because, and again, going back to what the government said in its application, that it said, while physical surveillance had some limited success, it was not likely to achieve the ultimate goals of the investigation without the aid of wire interception. So they were telling the district judge, we surveilled, but it didn't work. Well, they said it had limited success, but would not provide all the information, these are my words, that they wanted to achieve in their investigation. What's incorrect about that? Or was it an abuse of discretion for the district court to have made a ruling on the basis that that has been shown? In their application, they said, and again, I'm quoting it, they said that the main, and this is at JA 1203 to 1204, the government said that the main goal of the investigation was to identify the out-of-district sources of supply and other drugs for the Hemphill DTO. That's not my phrase, that's the government's phrase. Government's phrase, the main goal was to establish the source of the out-of-district drugs. And they knew that. They knew that before March 7th when they had submitted that application, so the judge never got to exercise her discretion because she didn't know about it. She did not know that the government had a poll camera up observing this Torrance, rather, California packaging mailing facility for at least maybe a month and had surveilled that particular aspect for that location for at least a month. I thought the argument was they didn't have, um, they weren't, despite their efforts, able to determine the identity of all the conspirators. Well, that's correct. They couldn't identify the identity of all the conspirators, but they knew full well who the main conspirators was because they saw them out in California. They knew they were traveling out in California to purchase drugs. They knew that they were purchasing drugs and they knew that they were shipping drugs to South Carolina through this mailing facility. They saw them, and I'm looking for my, what the case agent said, what he described was, and this is a JA-1284, initially we have learned from our poll camera before we went up on the Title III, and then he describes what they saw with that poll camera. They saw the main actors in the DTO coming to this facility, bringing drugs to this facility. They saw then Roland Rollins, who was the owner of the facility, who the government identified at that point in time as being the source of supply. They saw those packages going into his facility being repackaged, as they described in a professional manner, and then being sent out to addresses that were located in South Carolina. They knew all that. They knew all that and left it out of their application, and I would suggest to the court that that is the same thing as leaving out of the application the required authorization from the Department of Justice, and the same thing is if they get that authorization from the Department of Justice, they have to get it from someone who has authority to give that authorization. So I have questions on two other topics. One on sufficiency. This involves count 13. What evidence, this is the possession of with intent to distribute. What evidence do you think was missing? You claim the evidence was insufficient, but I'm not immediately clear what the evidence that you think was missing was. I would suggest to the court that what's missing is the actual drug transaction. There wasn't anything. You don't need to have a transaction to possess with intent to distribute? No, I agree with that. So what evidence was missing on the possession with intent to distribute? Because they only had possession. They didn't have the distribution, and I suggest that to be first. My client actually testified, and he didn't testify at trial, but he was seen on video saying I was using that marijuana for my personal use. The jury doesn't have to believe him, right? Jury doesn't have to believe him. Number two, however, objectively, when they searched the automobile that wrecked, there was this odor of marijuana, a substantial odor of marijuana. So obviously he was using it. They don't have to believe him that he was using for his personal use, but he was certainly using it because that's what they could smell. So my other question is the Speedy Trial Act. What states specifically do you think are included, and in particular, do you think that the continuance from April to August was not excluded? I'm just trying to make sure I understand how we calculate the Speedy Trial Act clock for your perspective. Judge, the exclusion that, and I see my time is up, but I'll answer your question. The exclusion that Judge Lewis applied for that period. So the April to August, we're talking about April. Right, exactly. Was as a consequence of Mr. Mann requesting and getting another attorney. You know, and in all candor, I don't know what to say about that other than the government waited four years and with all due respect to the AUSAs that handled this case, they're fine people and honest people and honorable people, but the government shouldn't have waited four years to bring this to the attention. Just to clarify, because there's a lot going on in this case, the four years, that's Hemphill's counsel. That's Hemphill's counsel. Mann's counsel is not affected by the government. Not affected by that. And if we were only talking about Mr. Hemphill's counsel, I think it was a clear violation of the Speedy Trial Act. If we're only talking about what? Mr. Hemphill's counsel, the relief of Mr. Hemphill's counsel, where the government waited four years. Isn't the law that if the time was sufficient or permissible or excludable for one, it applies to everybody? That is the law, your honor, but in these unique circumstances, I would suggest maybe we ought to take another look at that. Okay. The only other thing I would say, if I could, I know I'm out of time, the government made a point of my not moving to sever when Judge, I guess it was Judge Lewis disqualified Jack Swirling as Mr. Hemphill's counsel. I had previously moved to sever three times, two times parties when government had, when there were continuances granted. Not this time, but I had moved to sever two previously, two previous times and been denied. I just didn't want to make the hat trick of three denials. Okay. If you're honest, please. Yes, sir. Yes, sir. My name is Brian Allison. I represent the appellant Darrell Crockett in this matter. I am the most junior person in this particular matter, just coming in on this appeal. Now, I would, with the court's permission, I would just like to address the Speedy Trial Act violation in my limited amount of time. On July 9th, before we get to that, can I ask, did your client ever move to dismiss the indictment based on the Speedy Trial Act violation? Not that I'm aware of, Your Honor. Basically, Your Honor, Your Honors, on July 9th of 2018, the government knew that Attorney Jack Swirling represented the co-defendant, Mr. Hemphill, and a potential witness, Mr. Brock, and they did nothing for about three and a half years. It was only until the eve of trial that the government files a motion for privilege determination, which was granted, and then what happened was the case was continued by the district court, basically on an ends of justice decision. Now, basically, this was made over Mr. Crockett's and Mr. Ingram's objection, the continuance from April, when the court was supposed to be going, until August, which was about five to six months. Now, one thing we do not know is why it took so long for the government to come forward and say, hey . . . I'm not trying to cut you off on that. You may have a good argument, sound like the district court had some concerns about that too, but we have a new counsel, Mr. . . . for defendant man that the court, I think, largely relied on that and we have the law that says it's okay for one defendant, it's okay for all. How do you deal with that? . . . Well, it goes back to this delay, which I would contend and Mr. Crockett contends was unreasonable to sit for this long . . . on the excludable time, you think that it's not proper to do it? No, Your Honor, I would contend it's not because we don't know the reason . . . Do you have any authority that we can rely on on that? The only authority that I could come up with, Your Honors, was actually a state, not a state, but it was a district court case out of Maryland. It was the case of U.S. v. Massoud, and there what happened was that the court pressed the government on why it took so long to get to the point of a trial, and because of that, they found that that was dilatory and violation of the Speedy Trial Act. That's about the best I could offer, Your Honors, and because of that, basically what we have is the judge made really no findings of fact in this particular matter in making the continuance from the . . . first of all, allowing the removal of Mr. Swery without further information. We don't know because the court never pressed them, and so we don't have that evidence at all. So basically, Your Honor, we're just contending that there was a lack of diligence in coming forward with this particular motion for a determination of whether or not Mr. Swery should be removed. Because of that, Your Honors, we're asking the court in this particular matter to find that the ends of justice decision was clearly error because the court did not press and get some more information to base its decision on. We don't know. I mean, it could have been something more than just dilatory. We do not know, and all due respect to the government, I don't practice in South Carolina, but what we're asking for, Your Honors, is that the court consider that the district court could have basically taken this case, tried it with Mr. Crockett back in April as it was ready to do, and by putting this over for those additional months on top of the three and a half years, was just over the top. And we're asking the court to find that it was clear error and that this case be remanded for dismissal based on the Speedy Trial Act violation. If there are no other questions, I say I'm out of time. Thank you, Counselor. Ms. Hoffman. Good morning, Your Honors. Andrea Hoffman on behalf of the United States. I'll start with the Speedy Trial Act since that's where we ended, if that's all right with the court. In terms of the Speedy Trial issue, Mr. Hemphill's counsel was asked by the government or questioned or discussed with the government twice about his conflict with his two representative parties, Daryl Hemphill and Daniel Brock. And those are at record sites 228 and 248 in the JA. Both times, Mr. Swirling denied that he had any conflict and declined to remove himself from the case. By the time we got to December of 2021, the government's now in a trial prep mode itself and cannot prep Mr. Brock because he is represented by Mr. Swirling. Again, the government asked Mr. Swirling to withdraw from the case and he declined to do so, saying there was no conflict. It is at that point that the government moved for the continuance. As the court has recognized, the continuance granted on behalf of Mr. Mann was more than appropriate. Mr. Mann filed a motion in January of 2022 in which he reported to the court he had not heard from his counsel in over four months. His counsel didn't even bother. Can you, can, let, putting aside whether the motion was appropriate as to Mr. Mann, your, your first part of your presentation seemed to say we, the government wasn't dilatory with respect to moving to withdrawal based on the conflict of interest. Is that what I understand you to be doing? I, I don't think that the, it's always better if this had been raised earlier, Your Honor. I won't deny that, but I don't think that it rises to a circumstance in which the government did anything inappropriate. Given the context of this case, there were 10 continuances for COVID, for motions to dismiss, for new defendants being arrested, excuse me, for the stumble, changes of counsel for Mr. Mann multiple times, two different attorney issues having held, so . . . I'm not, I'm sorry to cut you off, counsel, but what if, what if, what if, hypothetically, this is all only hypothetically, we, we are to say, hey, that, that, that diligence is unacceptable. We were to find misconduct or something and that, does that, does that matter? I mean, if, if, if the continuance, if there's a conflict, you have to address the conflict, right? So, I, I know you're not going to concede and don't, but, but even if we assume that it was misconduct, what does that legally do to the Speedy Trial Act analysis? I think nothing, Your Honor, to be perfectly frank. It's other than a direction to the government to, to be more careful, to be more attentive to a timing of raising this at an earlier moment in this context. And that could be quite a firm one if the court really felt strongly about that. I don't think, for the reasons I was just saying, that rises to this. Setting aside that, it doesn't because this court found, the district court found plainly a required to cross-examine someone he mutually represents at the same time that he represents Mr. Hemphill. There was no way around that. If Mr. Hemphill had with, counseled, withdrawn at any of the times that he had been, this conflict had been raised to him, we wouldn't be in this situation either. But none, none of this happened. Could you move on to the Speedy Trial Act? I mean, not the Speedy Trial Act, we were talking about before. Long wait for me. The wiretap issue. Yes, sir. Yes, sir. Absolutely. I'm happy to. Particularly Mr. Lang's comments. I'm happy to switch to the necessity issue. The underlying affidavit on the face of it, on the terms of how it was granted, was plainly appropriate at that time. Now the question arises whether there were any omissions that were sufficient to call that earlier grant into question. And I would argue that there are not. There are three categories of things that were raised to the court on any significance at the suppression hearing, excuse me, in the district court. Those were two confidential sources and the California information. It is a misnomer to call the California information that the government had identified the source. What the government had identified was the shipping location, as the district court recognized in its discussion at the suppression hearing. The shipping point is not the source, and the shipping point wasn't the end all and be all that is suggested by defense counsel, because what was happening through this shipping location, as you can see, for example, at JA111, 1105-6, is that they weren't manifesting anything that they were shipping in any kind of regularity. So even if the government were going in and trying to obtain the records from that shipping company to see what was happening, they weren't being shipped, booked on the records for months afterwards. They were using false names to send the packages. They were using false names to deliver them, meaning the sender's name was false and the receiver's name was false. The addresses were all over the place. The shipping company was shipping all over the country. So there was no particular way for the government to isolate in. The government was using poll cameras, and that did provide some intel. I'm not to suggest that there was nothing going on in California, but this is not, you know, some omissions have more weight than others, and this was not an omission that rose to a level of concern for the district court once they heard this ample description of what was really occurring during the suppression hearing. How do we review the district court's determination about the omissions? What's our standard view on that? For the findings of facts, it's clear error. For any legal conclusions, it would be de novo. For the overall determination that there was necessity, sufficiently established, it's an abuse of discretion standard, Your Honor. And in this context, the two CIs, if you'd like more detail about that, the two CIs, the government clearly was able to establish to the district court that these CIs lacked credibility. They had either provided untruthful information at various points of the investigation, because as I would remind the court, this was an extensive, we've heard defense counsel talk about how broad and big this investigation was. These were two players in the middle of an enormous operation. We had details, we did have information, and we could tell when they were telling falsehoods to the government. Both CIs, Mr. Caldwell and Mr. Kempe Hemphill, declined to give information regarding Daryl Hemphill, one who was his brother and two was a close confidant of his. And at some point, Mr. Caldwell refused to cooperate in any manner. There was another conflict of counsel issue with respect to cooperating witnesses, because Mr. Caldwell's counsel also represented Mr. Hemphill at various points. So there was a variety, just a morass of things that the government felt rose to a level of lack of credibility. It is not the government's burden and nor should it be, or could it even workably be, to put in everything that they've looked at that they had to disregard because of lack of credibility or worthiness. So these omissions that are raised, yes, they can be argued and discussed, but none of them rise to a level that would trouble, should trouble this court and didn't trouble the district court who was on hand for the matter. Can I move you to count 11? Can you, can I go? Can I move you to count 11, please? What's your best authority for the fact that the gun in the car counsel between Ingram and the buyer is enough to establish that the firearm was in furtherance of the drug trafficking crime? This defendant got into that car, placed his gun and his drugs in that car. Notice I'm not asking you to describe the facts. I'm asking you to say what's your best authority for the proposition that the facts are enough. Oh, I'm sorry, Your Honor. Case law sites. You're going to catch me cold, sir, because I'm blanking right this second on a case site court. I know, I was briefing up on my fact sites more strongly than my case sites. I apologize, Your Honor. My best case site for that would be, I believe, you know, Your Honor, in Lomax, the transaction happened, but actually I'm going to backtrack. One of the best sites is the case that came out last week on April 28th. It's an unpublished opinion, Your Honor, but it came out on April 28th at Henderson in which the guns were inside the house with packaging materials. The drugs were outside of the house and the court found that that proximity of items in context to one another were... I think there were drugs in the house too in Henderson, but that's a fair point. If you have drugs in proximity to the firearm, there are plenty of cases on that. And there are many cases on that, Your Honor. And in this case, the defendant put them both into that vehicle to move it to this event. We know that he did that. That was a common practice for him. For example, if you look at Supplemental Appendix, page 55, where he has a telephone call where he instructs one of the female associates of his to put the guns and drugs in the car. This transaction or a different transaction? It's a different transaction, Your Honor. I'm just putting in context Mr. Ingram's behavior. He was arrested on the... In this particular incident, is there any evidence in the record about when that gun was put in the console? No, but there is evidence that the gun was in the car at that time. If you watch the actual video, the tone and the intonation that happens in a live entity as opposed to a cold record make it very clear they were describing a gun that was present. When Mr. Ingram says specifically, give me 300 and I'll give him this, he is discussing something. This is something that is there, not a gun that's someplace else. The CI, Mr. Brock, plainly discussed actually seeing the weapon. He didn't... The cameras is on his phone, so he wasn't able to turn the phone in and point it down at the gun and get a visual of the gun. But the this phrase, which is said in the transcript and in the recording, and it's very clear, plainly means we're talking about a gun that is there. And that gun's sitting... Here's your center console. You have two persons on either side of it. That gun is sitting between them during the duration of that transaction. Absent being in his hand, you don't get much closer or more deliberately with one. Mr. Ingram, every single time he was captured with drugs, was captured with a firearm. So it is very much his modus operandi. With respect to Mr. Gamble, just for a moment, since defense counsel had discussed that particularly, Mr. Gamble was identified as a pill maker in this trial before Mr. Gamble took the stand. At JA419, Mr. Hemphill identified Mr. Gamble as one of his pill makers. So that opportunity to have discussed him or to talk to the jury as Gamble being an alternative pill maker was viable in the trial if defense counsel had chosen to do so. He chose not to. There are a number of other issues that were briefed, Your Honors. I am happy to discuss any other issue that would be of use to this court. I don't want to belabor my time if you don't have need for any further amplification from me. Any questions? No further questions. Thank you, counsel. Thank you very much, Your Honors. Very briefly, Your Honors, in terms of the wiretap itself, the government uses the phrase in describing the owner of the express packaging and mailing facility as the source of supply. That's what they say. They identify him as the owner, and they say he is the source of supply. They described him as being the source of supply several times in the grand jury testimony of the case agent who signed the affidavit in support of the application. But they didn't tell, and they may have been mistaken. In fact, they were. There were two other guys that were actually the sources of supply. Whether they knew that at the time they submitted the application, I don't know. But the fact of the matter is, they did not tell Judge Seymour that they had identified, at least in their minds, and by they I mean the government, the source of supply, and that is the gentleman who owned that packaging and mailings facility in Torrance, California. They didn't do that, so she didn't have the opportunity to exercise her discretion to determine whether or not this application was necessary. That's all I can say about that, Your Honor. I think it's clear, at least in my mind, that this was an omission. It was a significant omission. We don't require law enforcement to die every T and cross every I, but we do require them to give a full statement of what they did and what failed, and the government simply did not do that in this case. In regard, Judge Huygens, to your question regarding, again, back to the January 19, 2003, and then the August 1, 2017, I'm sorry, 924C, I would suggest this. Prior to that transaction, there was no discussion of a gun, drug transaction. During the drug transaction, there was no discussion of the gun. It was only after the drug transaction had been completed and Brock was getting out of the car, they say, oh, by the way, you got a gun. The gun being there is purely incidental, and Judge Huygens, you're correct. There's absolutely no evidence of who put the gun in there. It was there, at least according to the testimony of Brock, and I see my time is up, all two minutes of it. I do appreciate the court's attention and questions. Thank you very much. Thank you, counsel. Before we adjourn, I want to just acknowledge and thank the defense counsel. I think you all are all court appointed, and we appreciate your service in that regard, as well as your arguments here today, and also thank Ms. Hoffman for her representation to the government. Before we come down to greet, I'll ask the clerk to adjourn court, and then we'll come down and greet you and take these under advisement. This honorable court stands adjourned, sign and die. God save the United States and this honorable court.
judges: A. Marvin Quattlebaum Jr., Allison J. Rushing, Toby J. Heytens